IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) NO. 3:17-cr-00238 |
| v. | ) |
| | ) JUDGE RICHARDSON |
| | ) |
| TAVARIE ALEXANDER WILLIAMS | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Sealed Motion for a New Trial (Doc. No. 256-1, "Motion"),[1] and his Supplemental Motion for New Trial (Doc. No. 291, "Supplemental Motion"). The Government has responded in opposition to both motions in a consolidated response (Doc. No. 303, "Response"). Defendant did not file a reply.

### BACKGROUND

On December 13, 2017, Defendant was indicted in this case on three counts: sex trafficking a child, in violation of 18 U.S.C. §§ 1591(a), (b)(1), and (c)[2] (Count One); transportation of a minor, in violation of 18 U.S.C. § 2423(a)[3] (Count Two); and possession of a firearm by a

---

[1] The Motion was filed under seal and remains under seal to the extent that the information therein is not specifically referenced herein.

[2] A conviction for sex trafficking of a child, in violation of 18 U.S.C. § 1591, requires that: (1) defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means the victim; (2) defendant knew or recklessly disregarded the fact the victim was under 18 years of age and would be caused to engage in a commercial sex act; and (3) the offenses were in or affected interstate commerce. *United States v. Bryant*, 654 F. App'x 807, 813 (6th Cir. 2016).

[3] A conviction for transportation of a minor, in violation of 18 U.S.C. § 2423(a), requires that an individual "knowingly transport[] an individual who has not attained the age of 18 years in interstate or foreign commerce . . . with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense . . . ."

1

convicted felon, in violation of 18 U.S.C. §§ 911(g)(1) and 924 (Count Three). (Doc. No. 1).[4] A jury trial commenced on January 28, 2020. (Doc. No. 186).

At trial, the minor victim (hereinafter, "Ms. Doe") testified that on June 20, 2016, Defendant picked her up in San Antonio, Texas, and brought her back to his hotel room. (Doc. No. 279 at 49-50). Ms. Doe was twelve years old at the time. (*Id*. at 47). That same night, Defendant posted an online advertisement of Ms. Doe on Backpage.com, which Defendant described to her as a "sex trafficking app." (*Id*. at 51). Ms. Doe testified that Defendant prostituted ("pimped out") Ms. Doe to paying customers by setting up the tricks[5] and instructing Ms. Doe to have sex with the tricks, collect their money, and give it to Defendant. (Doc. No. 279 at 52-56). Defendant also had sex with her himself. (*Id*.). Over the next 39 days, Defendant and Ms. Doe traveled from Texas to various cities in Tennessee. (*Id*. at 57-58). During the course of their travels, Defendant continued to pimp out Ms. Doe. (*See generally* Doc. No. 279). On July 29, 2016, five weeks after Ms. Doe met Defendant in San Antonio, Texas, police found Ms. Doe at a hotel in Franklin, Tennessee with Defendant. (*Id*. at 127).

Besides Ms. Doe's testimony as to the above-described events, other testimony and evidence admitted at trial supports that notion that Defendant pimped out Ms. Doe. For example, Victoria Hightower testified that Defendant informed her, a prostitute herself, that he had a "new girl" and that he brought Ms. Doe to meet Ms. Hightower so that Ms. Hightower would teach her the proper "protocol." (Doc. No. 277 at 66, 71-76). Arterio Holman testified that he traveled with Defendant and Ms. Doe from Texas to Tennessee and that Defendant informed him that he was

---

[4] Defendant was charged in Williamson County and Davidson County with state crimes based on the same alleged conduct upon which the Indictment in this case was brought.

[5] "Trick" (like "john," for that matter) is a word commonly used to describe a prostitute's customer. (Doc. No. 277 at 53-54). It seems that the term alternatively may be used at times to refer instead to a *job with* a customer. When used herein, however, the term carries the former meaning.

2

"setting up dates for this little girl when we got back to the hotel room."[6] (Doc. No. 280 at 24, 52). Ads on Backpage.com were posted by someone using a cellphone with a number that was registered to Defendant during the time Defendant was with Ms. Doe, with taglines (which expectedly were not always grammatically clear or correct) including: "Tonight's threat is on me guys" (Doc. No. 278 at 25, Tr. Ex. 21A at 1),[7] "After a hard days work, I'm the antidote you need for relaxing" (*id*. at 37, Tr. Ex. 21C at 1), "Seeking a freak well u call and get me the greatest of my time" (Tr. Ex. 20 at 30), and "Paris last night for u guys to try my pleasure" (Tr. Ex. 21B at 1). One of the ads included photos of Ms. Doe.[8] (Doc. No. 20 at 30). Additionally, numerous text messages between phones registered to Defendant reveal that Defendant was instructing someone to whom he had given a phone (during the time Ms. Doe was with him) what to do with tricks, how much to charge, and how to collect the trick's money. (*See* Doc. No. 30). For example, the following text exchanges between Defendant and Ms. Doe were introduced into evidence: "There is no car out there; Bitch wtf u got going on? u got tha money; I got the 100; Ok get it over quick; Ok baby; He is leaving" (Tr. Ex. 31A at 1); "U got ur money right; Yah I got the 100 baby" (*id*. at 7); "Tell him u give him a blow job for 100" (*id*. at 11); and "He wants to fuck; go ahead" (*id*. at 12).

On February 6, 2020, the jury returned a verdict of guilty on Counts One and Two, and not guilty on Count Three. (Doc. No. 227). That same day, the Court set sentencing for June 8, 2020. (Doc. Nos. 226, 231). Since then, sentencing has been postponed several times upon motion of

---

[6] "Date" is a word commonly used by prostitutes to describe when a prostitute meets up with a customer. (Doc. No. 277 at 54).

[7] It seems likely, if not certain, that the word "threat" was the result of a typographical error.

[8] Ms. Doe herself testified that she was the person in these pictures. (Doc. No. 279 at 65).

3

one party or the other, although at present no sentencing date is scheduled, pending resolution of the Motion and Supplemental Motion.

On October 22, 2020, Defendant filed the Motion, requesting a new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. No. 256-1). On November 12, 2020, Defendant sent a *pro se* letter to the Court requesting new counsel. (Doc. No. 259). After a hearing on Defendant's request, the Court denied Defendant's request to terminate his current counsel but did appoint him a second counsel of record. (Doc. No. 269). On June 1, 2020, Defendant's new counsel filed the Supplemental Motion, which set forth additional arguments in support of defendant's bid for a new trial. (Doc. No. 291). On August 30, 2021, the Government responded to both the Motion and the Supplemental motion, in a single filing. (Doc. No. 303). Accordingly, this matter is now ripe for review.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A Rule 33 motion for a new trial "calls on the trial judge to take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018). The Court has broad discretion to decide a motion for a new trial, but it "should exercise such discretion only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988); *see also United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976) ("Motions for a new trial are not favored and are granted only with great caution."). "The defendant bears the burden of proving that a new trial should be granted." *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

## ANALYSIS

**I. The Motion**

Via the Motion, Defendant argues that a new trial is warranted based on "newly discovered information." Defendant also (apparently) argues that a new trial is warranted because this new information is *Brady* material that the Government suppressed.[9]

Defendant bases this argument on two pieces of information that he obtained post-trial: (i) a September 30, 2020 email from one of the assigned prosecutors (Assistant United States Attorney (AUSA) Schiferle) to defense counsel wherein the AUSA represents that she obtained information about an event involving Ms. Doe that occurred after trial (Doc. No. 253, "Exhibit A"); and (ii) a June 1, 2017 "Narrative Regarding Potential *Brady* Material" that was authored by the assistant district attorney on Defendant's state case (Doc. No. 253-2, "Exhibit B"). After describing applicable legal standards, the Court will explore in turn whether either piece of information warrants a new trial.

A. *Newly Discovered Evidence Legal Standard*

Rule 33 of the Federal Rules of Criminal Procedure provides, in pertinent part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Not surprisingly, it is possible that in a particular case, justice will so require in light of newly discovered evidence. But "[t]o demonstrate that a new trial is warranted on the basis of newly discovered evidence, a defendant must prove: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; **(3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would**

---

[9] In the Motion, it is not clear which piece of information Defendant attacks as undisclosed *Brady* material. Out of an abundance of caution, the Court will proceed as if Defendant is asserting that both pieces of information are undisclosed *Brady* materials that warrant a new trial.

5

**likely produce acquittal.**"[10] *United States v. Jenkins*, 726 F. App'x 452, 457 (6th Cir. 2018) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)) (emphasis added). "The burden of proof rests with the defendant." *Id.* (citing *United States v. McLain*, 9 F. App'x 463, 464 (6th Cir. 2001)).

"Undisclosed evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Ramer*, 883 F.3d 659, 672 (6th Cir. 2018) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992)). "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Ramer*, 883 F.3d at 672 (quoting *Bales v. Bell*, 788 F.3d 568, 574 (6th Cir. 2015)) (alteration in original) (internal quotation marks omitted).

B. *Brady Material*

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). These principles

---

[10] Given what it means (as discussed below) for evidence to be "material" in this context—*i.e.*, that the evidence like would have resulted *in a different outcome*—the Court questions the extent of which the third requirement is actually distinct from the fourth requirement (*i.e.*, that the evidence likely would have resulted in an acquittal). But, for whatever it is worth, the fourth requirement is treated by the Court as a separate requirement, per binding precedent.

Further, the question of whether "the evidence would likely produce acquittal" appears to be a backward-looking question, *i.e.*, the question is whether the evidence if introduced would have produced an acquittal at Defendant's trial that already occurred, not whether the evidence would produce an acquittal at some hypothetical future trial. *See Jenkins*, 726 F. App'x at 461 (analyzing the fourth prong of the newly-discovered-evidence test and explaining that "had [the evidence] been admitted . . . the case would not have resulted in an acquittal").

6

have been extended to the disclosure of impeachment evidence in cases where the "reliability of a given witness may well be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (internal quotation marks omitted). **"To establish a violation of *Brady*, a defendant "has the burden of showing that** the Government suppressed evidence, that such evidence was favorable to the defense, and that **the suppressed evidence was material."** *United States v. Smith*, 749 F.3d 465, 489 (6th Cir. 2014) (internal quotation marks omitted) (emphasis added). Reversal is warranted only when "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome [(which is the same definition of materiality used in determining whether newly discovered evidence warrants a new trial)]." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994).

C. *Sept. 30, 2020 Email (Exhibit A – Doc. No. 256-1 at 8)*

Defendant relies on an email from AUSA Schiferle to defense counsel wherein she represents that she obtained information about an event that occurred after the conclusion of trial. (Doc. No. 256-1 at 8). Her email states that in the Spring of 2020 (which would have been after the February 2020 conclusion of trial), Ms. Doe alleged that she had consensual sex with a boy at her school but later recanted the statement. (*Id.*). And in August 2020, according to AUSA Schiferle's email, Ms. Doe alleged that she was raped at school, but DCS and Ms. Doe's therapist determined (based on the facts/timing given by Ms. Doe) that the allegation did not warrant any investigation.[11] (*Id.*).

Defendant argues that this information is "material to the production of a different outcome" in Defendant's case. Defendant asserts that he was convicted based on Ms. Doe's

---

[11] The email is not clear as to whether the later alleged rape involved the same alleged incident that Ms. Doe previously had characterized as consensual sex.

testimony, and "[s]ince the conclusion of trial, new evidence has surfaced that speaks directly to the credibility of [Ms. Doe]." (Doc. No. 256-1 at 4).

The Government argues that the statements Ms. Doe made after trial are not material because they concern events unrelated to the events underlying Defendant's charges. (Doc. No. 303 at 10). And "defendant's convictions can be upheld given the weight of the other evidence: testimony of other witnesses, Backpage.com advertisements, text messages, and DNA evidence." (*Id*.). The Government further argues that Defendant has not shown that the new information would likely produce an acquittal, "because the unrelated allegations do not directly relate to the charges against defendant to be able to produce a different result at trial." (*Id*.). Also, the Government argues that throughout the trial Ms. Doe was thoroughly cross-examined and impeached on other inconsistent statements and alleged false allegations and "[i]t is not likely that an additional impeachment tool would have changed the fact that the jury saw truth in the core of her testimony." (*Id*. at 10-11).

The Court agrees with the Government that this evidence is not material and would not likely have produced an acquittal. To be material, the "newly discovered evidence must pertain to facts which existed at the time of trial, not later events." *United States v. Welch*, 160 F. Supp. 2d 830, 833 (N.D. Ohio. 2001) (citing *Davis v. Jellico Cmty. Hosp., Inc*., 912 F.2d 129, 135 (6th Cir. 1990)). Ms. Doe's allegation of having consensual sex with a boy at her school, her later recantation of that allegation, and her reportedly unsubstantiated rape allegation of August 2020 all occurred after Defendant's trial ended in February 2020. Accordingly, this information contained within the email is not material, because it discloses only facts that did not exists at the time of Defendant's trial.

Additionally, the information relayed in the email is immaterial because the allegations made by Ms. Doe are unrelated to Defendant's case and would serve merely as another basis to impeach Ms. Doe. The Sixth Circuit explained in *United States v. Davis* that evidence obtained post-trial regarding a witness at the trial is immaterial (and therefore does not warrant a new trial) when the evidence involves the witness's actions in an unrelated case[12] and therefore would be useful at a new trial only for impeachment purposes. 15 F.3d at 532 (finding that information regarding a witness who testified in the defendant's drug possession case and was later discovered to have planted evidence in another case was immaterial, because "the mere existence of impeaching evidence does not warrant a new trial"). This is especially the case where the witness's "credibility has already been shown to be questionable." *Ramer*, 883 F.3d at 672. At trial, Defendant had *numerous* opportunities to impeach Ms. Doe at trial, and seized upon those opportunities. (*See* Doc. No. 279 at 105-09, 111-12, 115-16, 118-19, 121, 153-54, 157-58). Thus, any additional information undermining Ms. Doe's credibility is simply immaterial. *See Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) ("Where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."). Having observed the trial, the undersigned (in his above-referenced capacity as a "thirteenth juror") can say without hesitation that it was entirely clear to all concerned that Ms. Doe's testimony was false (whether or not knowingly false) on multiple topics—including at least one topic that undisputedly was relevant to Defendant's guilt

---

[12] It stands to reason that this rule would apply whether the information received post-trial concerned actions of the witness taken before trial or (as in the case of Ms. Doe's actions) after trial; the information about those actions would be immaterial, irrespective of when those actions occurred, because they would serve only to impeach the witness. But if the information did concern the witness's actions after trial, as discussed above the information would be immaterial also *precisely because* it concerned actions that occurred post-trial.

9

on one or both counts, *i.e.*, whether Defendant deprived her for weeks on end of virtually all food and sleep.[13] (Doc. No. 265 at 86-90). Because Ms. Doe was impeached, and exposed as having testified falsely on a material issue,[14] the additional impeaching information would have had added little even if it otherwise potentially could have been deemed material. Additionally, the impeaching material does not directly go to whether the elements of Counts One and Two are satisfied. Whatever impeachment may have occurred based on this information would have related only to the details, and would not have contradicted the brunt of the Government's case: that Defendant transported Ms. Doe across state lines to prostitute her.

Finally, Defendant's argument about the potential impact of this impeachment evidence ignores the strength of the case against him on Counts One and Two (*i.e.*, sex trafficking a child and transportation of a minor). At trial, the Government provided overwhelming evidence of Defendant's guilt on Counts One and Two. As noted above, ads posted by Defendant on Backpage.com, text messages between Defendant and Ms. Doe, and the testimony of other witnesses (Holman and Hightower) support a jury finding that Defendant was pimping out Ms.

---

[13] The undersigned finds it regrettable that the Government did not take action of any kind to respond to the fact that it had elicited testimony that (after hearing it) the Government surely must have known was false, other than to briefly and rather blithely excuse it, downplay it, and explain it away in its closing argument. Without telling the Government, unprompted, what it should have done, the Court can think of multiple alternative corrective actions the Government could have taken. On the other hand, the Court has little doubt that the Government had no idea that Ms. Doe was going to provide the testimony she did provide that was patently false, and that the Government was (silently) rather chagrined when Ms. Doe provided this testimony. In addition, the Court has no doubt that Defendant was not prejudiced by this false testimony, because the jury would have recognized it as obviously false. To the contrary, he was aided by it because it give him a clear and legitimate path to attack Ms. Does's testimony not only on the particular subjects as to which her testimony was false, but also as a general matter.

[14] Ms. Does's testimony claiming uber-severe deprivation of food and sleep (which is discussed further below) was relevant at least insofar as such deprivation naturally *could* have served as a means for Defendant to: (a) "maintain" Ms. Doe, which is one alternative way in which the first element of sex trafficking of a child, in violation of 18 U.S.C. § 1591, could be satisfied in this case; and (b) maximize his chances of successfully "transport[ing]" Ms. Doe in interstate or foreign commerce (by thus weakening her and making her more compliant and easy to transport), as required by the first element of transportation of a minor, in violation of 18 U.S.C. § 2423(a). But although the *topic* of this false testimony was material: (a) the testimony itself was not material, because no reasonable juror would have believed it, and (b) the *falsity* of the testimony was not material because the jury certainly would have perceived such falsity and, if anything, held it against the Government (and its star witness's credibility) and not against Defendant.

10

Doe. And this evidence demonstrated Defendant's guilt on Counts One and Two, irrespective of Ms. Doe's testimony. The Government's case was also strengthened by Defendant's own (exculpatory) testimony, which the jury could (and obviously did) reject and take as a further sign of Defendant's guilt. *Cf., e.g., Phillips v. Rewerts*, No. 1:19-CV-842, 2021 WL 2301952, at *15 (W.D. Mich. May 3, 2021), *report and recommendation adopted*, No. 1:19-CV-842, 2021 WL 2291904 (W.D. Mich. June 4, 2021) (noting that lying to police is evidence of a guilty conscience). Significantly, during his testimony, Defendant admitted that he was familiar with Backpage.com and knew how to set up an account on it (Doc. No. 281 at 128), that he was familiar the relevant email address associated with the Backpage.com postings (that he claimed was created by Victoria Hightower) (*id*. at 128-30), that he met Ms. Doe in San Antonio and took her to his hotel room (*id*. at 121-23), that Ms. Doe traveled with him and Mr. Holman from Texas to Tennessee (although he claims she did so without his knowledge while he was asleep during the drive) (*id*. at 135-36), that Ms. Doe stayed with him at his mother's house in Memphis (*id*. at 137), and that he stayed in hotels with Ms. Doe while in Tennessee (according to Defendant so she could watch his son) (*id*. at 142). All of these admissions help to establish Defendant's guilt, to the extent the jury could (and did) reject Defendant's exculpatory explanations for the otherwise inculpatory events and circumstances to which he admitted. Accordingly, the Court can say, at the very least, that a reasonable jury would have been justified in finding Defendant proven guilty on these counts beyond a reasonable doubt, even if all of Ms. Doe's testimony was disregarded as not credible.

For each of these alternative reasons, the Court cannot conclude that there is any "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Bagley*, 473 U.S. at 682. Accordingly, Defendant has not shown that the information is material, and this information does not support granting a new

11

trial under Rule 33. This in turn means that it likewise does not support granting a new trial based on *Brady*. *See Ramer*, 883 F.3d at 674 (explaining that the court did not need to reach the issue of whether a *Brady* violation occurred, because the defendant's request for a new trial was denied on the basis of the immateriality of the evidence). And for these same reasons, Defendant has not shown that this information would likely produce an acquittal. Accordingly, the Court declines to grant the Motion based on the information contained within the September 30, 2020 email from the AUSA, is denied.

D. *Narrative Regarding Potential Brady Material (Doc. No. 256-1 at 9)*

Defendant also relies upon a narrative dated June 1, 2017 (prior to the filing of the Indictment in this case) by the ADA in Defendant's state case. The Narrative explains that the victim (Ms. Doe) informed the ADA that when she was in the hotel in Franklin, she awoke with Defendant's penis in her face, but that he did not have time to put his penis in her mouth before the cops came to the door. (*See* Doc. No. 256-1). According to the Government, the ADA provided the Narrative to the defense in Defendant's state case because Ms. Doe's statement contradicted what she had stated in a prior forensic interview: that she had engaged in oral sex with Defendant that morning. (Doc. No. 303 at 18).

Defendant argues that this evidence is material, because it "completely contradicts statements made by the witness at trial." (Doc. No. 256-1 at 4). "Discerning whether or not Mr. Williams sexually assaulted the victim is material to rendering a verdict and applies to sentencing." (Doc. No. 256-1 at 6).[15]

---

[15] The Court notes that the statement could also be relevant here in the sense that a defendant surely can "maintain" a victim, for purposes of Count I, by dominating them via, inter alia, sexual assault. But although the statement may be relevant, that does not mean that the statement is "material" (as defined above) here, in light of all of the evidence showing the elements of Counts I and II being met irrespective of whether Defendant sexually assaulted Ms. Doe.

12

On October 15, 2020, Defendant's counsel sent an email on October 15, 2020, to the AUSA inquiring about a memorandum written by a state prosecutor pertaining to Defendant's state charges. (Doc. No. 303 at 5). The Government maintains that it promptly contacted the ADA assigned to Defendant's state case, received the memorandum, and provided the memorandum to Defendant's counsel on the following day via email. (*Id*.; Doc. No. 303-4).[16]

The Government notes (correctly) that Ms. Doe was not asked at trial about what she and Defendant were doing before the police arrived on either direct or cross-examination; thus, the information does not contradict anything that Ms. Doe said at trial.[17] The Government also argues that the narrative would have served only to impeach Ms. Doe on a minor detail, and as noted above, Defendant had numerous opportunities to impeach Ms. Doe at trial, therefore, the information is not material. Finally, the Government argues that the information would not have produced an acquittal because the information contained within the Narrative has no bearing on Defendant's convictions (*i.e.*, sex trafficking a child and transportation of a minor). (Doc. No. 303 at 12).

The Court agrees with the Government that this information is not material and would not likely have produced an acquittal for Defendant at trial. While this information is undoubtedly

---

[16] The Government asserts that the Narrative was unknown to the Government until October 15, 2020, when defense counsel contacted the AUSA via email inquiring about the Narrative. Because the Court decides herein that a new trial is not warranted pursuant to *Brady* because the information contained in the Narrative is not material, it need not determine whether the Government's assertion that they were not aware of the Narrative is true, and if it were true, whether that would defeat Defendant's *Brady* argument.

[17] True, if Defendant's counsel had known that the narrative existed, perhaps she would have raised this topic on cross-examination of Ms. Doe in an attempt to elicit an answer she then could impeach by using the narrative, in an attempt to impair Ms. Doe's credibility more generally. This is sheer speculation, however. Moreover, any such impeachment would have served to impeach Ms. Doe only on an unimportant detail, as is clear from the fact that both sides ignored this topic at trial. Thus, any such impeachment would have gained Defendant little, especially since Ms. Doe had already been impeached in some topics and had been revealed to all to have provided false testimony on a material topic, as discussed above.

more relevant than the allegations made by Ms. Doe discussed above about an unrelated matter, the information is nonetheless immaterial, because it would serve only to impeach Ms. Doe.

As described above, Defendant had numerous opportunities to impeach Ms. Doe during trial, (*see* Doc. No. 279 at 105-09, 111-12, 115-16, 118-19, 121, 153-54, 157-58), and the information contained in the Narrative would only serve to offer another basis to impeach Ms. Doe. *See Robinson*, 592 F.3d at 736. Further, as also described above, plenty of evidence introduced at trial supports a finding of Defendant's guilt on Counts One and Two, irrespective of Ms. Doe's testimony. Moreover, despite Defendant's assertion to the contrary,[18] the Court has scoured the trial transcript and it does not appear that Ms. Doe testified at trial as to whether Defendant's penis was in her face before she was rescued, or about what she or Defendant were doing before police entered the room at all. Thus, the information does not directly contradict Ms. Doe's trial testimony. Accordingly, Defendant has not shown that the information within the Narrative is material. Further, Defendant has not shown that this information within the Narrative would likely have produced an acquittal; in fact, in light of the strength of the Government's evidence, there is no reason to believe that it would have. Therefore, the late disclosure of the Narrative does not support granting a new trial on the basis of Rule 33. Nor does the late disclosure support granting a new trial pursuant to *Brady*, because even assuming arguendo that Defendant had shown that the Government suppressed the evidence, he has not shown "that the suppressed

---

[18] As noted above, Defendant argues in the Motion that the information in the Narrative "directly contradict the witnesses testimony during the trial." (Doc. No. 256-1 at 4). Due to the lack of an apostrophe, the reader cannot determine whether Defendant's use of "witnesses testimony" is meant to be possessive singular (referring only to a single witness, presumably Ms. Doe) or possessive plural (referring to multiple witnesses, presumably one of which is Ms. Doe).

Because the Motion focuses on Ms. Doe's credibility (or lack thereof) the Court will assume this is a reference to her testimony (and only her testimony). To the extent Defendant did intend to mean the information in the Narrative contradicted another witness's testimony, it would remain immaterial, and thus would not warrant a new trial, for the same reasons discussed above (i.e., the weight of the evidence against Defendant). But in any event, Defendant's whole argument here is a non-starter because she does not cite to the trial transcript to identity the applicable purported testimony and the Court has no idea what testimony she could possibly be referring to.

evidence was material." *Smith*, 749 F.3d at 489. Accordingly, the Motion, to the extent that it is based on the information contained within the Narrative, is denied.

**II. The Supplemental Motion**

In his Supplemental Motion, Defendant asserts that the Court should correct the "miscarriage of justice" and grant a new trial, because of the numerous inconsistencies in Ms. Doe's trial testimony. (Doc. No. 291 at 1). Defendant recounts numerous inconsistent statements made by Ms. Doe by comparing the trial transcript, the original statement Ms. Doe made during a forensic interview on July 30, 2016, the statement Ms. Doe made to law enforcement on July 31, 2016, and the trial testimony of other witnesses. (*Id.*). He argues that "Ms. Doe's testimony is devoid the reliability, trustworthiness, and confidence needed to provide confidence in the convictions of Mr. Williams. Her testimony is the foundation of the convictions. . . . Mr. Williams' liberty cannot be taken based upon the proof presented at the trial, especially in light of the major material credibility issues with Ms. Doe. (Doc. No. 291 at 9-10).

The Government argues that the inconsistencies are immaterial to the outcome of the case—the inconsistencies did not involve the elements of the crimes charged and were rather minor. (Doc. No. 303 at 21-28).

The Government "may not knowingly present false evidence." *United States v. Fields*, 763 F.3d 443, 462 (6th Cir. 2014) (citing *Miller v. Pate*, 386 U.S. 1 (1967). "A conviction obtained through the knowing use of perjured testimony must be set aside if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Id.* (quoting *Giglio*, 405 U.S. at 154). "To establish such a tainted result, [the defendant] must show that: (1) the statement was actually false; **(2) the statement was material**; and (3) the United States knew it to be false." *Id.* (citing *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986)). The burden "is on the

15

defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by Government witnesses do not establish knowing use of false testimony." *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010) (quotation omitted).

In determining whether the false testimony was material, "the Court must apply either the "reasonable likelihood" or the "reasonable probability" standard." *United States v. Yang*, 74 F. Supp. 2d 724, 731 (N.D. Ohio 1999). "The choice between these standards depends on the 'nature of the evidence and the culpability of the government.'" *Id*. (quoting *Hawkins*, 969 F.2d at 175). If the Government knew or should have known of a witness's false testimony, "the conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *O'Dell*, 805 F.2d at 641 (citing *Bagley*, 473 U.S. at 682). If the Government did not know of the witness's false testimony at trial, the standard is more challenging for the defendant: "the evidence will be considered material and the conviction set aside 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *O'Dell*, 805 F.2d at 641 (quoting *Bagley*, 473 U.S. at 682).

The Government goes through lengths to argue that the pinpointed areas of Ms. Doe's trial testimony are mere inconsistencies, and the Government did not knowingly use false testimony. The Court need not decide whether the Government knowingly used false testimony, because even assuming that the Government knew that certain parts of Ms. Doe's testimony were false, such that defendant need meet only the less demanding standard, Defendant here could not meet even that standard, because there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. *See O'Dell*, 805 F.2d at 641. Accordingly, the false testimony (assuming it is false) is not material and does not warrant the grant of a new trial.

Defendant points out the following areas of Ms. Doe's trial testimony that were inconsistent with statements she gave during interviews with law enforcement:

- Ms. Doe testified at trial that she did not wave back after Defendant waved to her during their initial encounter. During law enforcement interviews, Ms. Doe stated that she waved back twice. (Doc. No. 291 at 3).

- At trial, Ms. Doe testified that Defendant put a gun to her head and forced her in the car. During law enforcement interviews she did not mention the gun and stated she "hopped" in his car. (*Id*. at 4).

- At trial, Ms. Doe testified that she had never met Mr. Holman before she was picked up by Defendant. During a law enforcement interview, she stated that she had known Mr. Holman for two years. (*Id*.).

- Ms. Doe testified at trial that she had sex with at least four to five men on the first night she was picked up by Defendant. In a law enforcement interview, she stated she had sex with ten men on her first night with Defendant in San Antonio, and later in that same interview stated she had sex with only one man while in San Antonio. (*Id*.). In another law enforcement interview, she stated that she did not have sex with any men in San Antonio, and later said that she had sex with four men in San Antonio during that same interview. (*Id*. at 5).

- Ms. Doe testified at trial that Mr. Holman tried to have sex with her, but it did not happen. Ms. Doe told a law enforcement officer during preparation for trial that Mr. Holman had raped her. (*Id*.).

- Ms. Doe testified at trial that she had sex with three or four men in Memphis, and in a prior law enforcement interview she had stated that she did not have sex with any men in Memphis. (*Id*. at 6).

- Ms. Doe testified at trial that her and Defendant traveled from Memphis to Knoxville. During a law enforcement interview, Ms. Doe stated that her and Defendant went from Memphis, to Nashville, then to Knoxville. (*Id*.).

- At trial, Ms. Doe testified that she had sex with three men at the La Quinta hotel in Nashville. During a law enforcement interview, Ms. Doe testified that she had sex with ten men at the La Quinta hotel in Nashville. (*Id*. at 7).

- Ms. Doe testified at trial that she did not have anything to drink or eat for thirty-nine days while she was with Defendant. Although Ms. Doe did not make an inconsistent statement

17

during an interview, Defendant argues that this statement must be a total fabrication, as a human cannot go thirty-nine days without food or water.[19] (*Id.*).

The Court does not begrudge Defendant consternation at such trial testimony, which he understandably contends is false. And as to the last bullet point, as noted above, the Court agrees that the testimony was obviously false. But even assuming that the inconsistent statements made at trial by Ms. Doe are false, Defendant has not shown that there is any reasonable probability that the false statements would have affected the judgment of the jury on Counts One and Two. While the highlighted inconsistencies are numerous, these inconsistencies do not directly go to whether the elements of Counts One and Two are satisfied; more generally, they likewise do not tend to cast doubt on the gravamen of the Government's entire theory of the case: that Defendant transported Ms. Doe across state lines to pimp her out. Thus, the details of Ms. Doe's testimony that are inconsistent with her pretrial statements (*i.e.*, the differences in the number of men that Ms. Doe had sex with in certain locations, the order of cities visited, details regarding the initial encounter of Ms. Doe and Defendant, etc.) do not have any reasonable likelihood of affecting the judgment of the jury. *See O'Dell*, 805 F.2d at 641. And the same is true for her obviously false testimony about her deprivation of food and sleep, for the reasons discussed above.

Further, Defendant's argument about the potential impact Ms. Doe's testimony had at trial (describing Ms. Doe's testimony as the foundation of Defendant's convictions (Doc. No. 291 at 9)) again ignores the strength of the Government's case against him on Counts One and Two despite Ms. Doe's testimony. A Rule 33 motion for a new trial "calls on the trial judge to take on

---

[19] The Court agrees that Defendant has a valid basis for calling this particular testimony a complete fabrication. And the undersigned would add that in his view, Ms. Doe's demeanor in testifying on this point—an apparent lack of conviction about what she was saying and a lack of appreciation of what naturally would be the impact on her of such total and severe deprivation—further supports the view that Ms. Doe's claim of such deprivation was entirely false. The Court declines to speculate as to why Ms. Doe made such a claim and as to the extent to which she knew it was false.

18

the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *Mallory*, 902 F.3d at 596. As explained above, Ms. Doe was impeached numerous times at trial, and it was obvious to the undersigned (and surely also the jury) that Ms. Doe was not a credible witness in at least some respects. On the other hand, as this and other courts in this circuit effectively instruct jurors on a regular basis, the fact that a witness is not credible on one or more points does not necessarily mean that the witness is not credible on other points. *See* Sixth Circuit Pattern Criminal Jury Instruction 1.07. A jury here could, and in the undersigned's view, should have believed the vital underlying thrust of Ms. Doe's testimony about Defendant's use of (and travel with) her even while rejecting her testimony on various details.

In any event, there was more than sufficient evidence for the jury to convict Defendant on Counts One and Two, likely due to the volume and probativeness of other evidence that existed that supported a finding of Defendant's guilt (discussed above), irrespective of Ms. Doe's testimony. Accordingly, the Court finds that Defendant has not shown that Ms. Doe's (assumed) false testimony (although abundant) had any reasonable likelihood of affecting the judgment of the jury, and therefore, the false statements are not material. Thus, the undersigned, acting as the metaphorical thirteenth juror, does not find that a miscarriage of justice occurred.

## CONCLUSION

In summary, Defendant simply has not shown the "extraordinary circumstances" that warrant a new trial "where the evidence preponderates heavily against the verdict." *Ashworth*, 836 F.2d at 266. Therefore, for the above-described reasons, Defendant's Motion (Doc. No. 256-1) and the Supplemental Motion (Doc. No. 291) are DENIED. The Court will enter an order setting Defendant's sentencing in due course.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE